Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

```
In Re:  TFT-LCD (Flat Panel)        )
Antitrust Litigation.               )
_____) NO. M 007-01827 SI
```

San Francisco, California
Friday, December 9, 2011

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

| | |
|---|---|
| **For Plaintiff**<br>**Indirect Purchasers:** | Zelle Hoffmann Voelbel Mason & Gette<br>44 Montgomery Street, Suite 3400<br>San Francisco, CA  94104 |
| BY: | **CRAIG C. CORBITT, ESQUIRE**<br>**JUDITH A. ZAHID, ESQUIRE**<br>**PATRICK BRADFORD CLAYTON, ESQUIRE** |
| **For Direct**<br>**Purchaser**<br>**Plaintiffs:** | Alioto Law Firm<br>225 Bush Street, 16th Floor<br>San Francisco, CA  94104 |
| BY: | **THERESA DRISCOLL MOORE, ESQUIRE**<br>**JOSEPH MICHELANGELO ALIOTO, JR., ESQ.** |
| **For Indirect**<br>**Purchaser**<br>**Plaintiffs:** | Steyer Lowenthal LLP<br>One California Street, Third Floor<br>San Francisco, CA 94111 |
| BY: | **ALLAN STEYER, ESQUIRE** |
| **For Plaintiff**<br>**Indirect Purchaser**<br>**FME Architecture &**<br>**Design:** | Cooper & Kirkham, P.C.<br>357 Tehama Street, Second Floor<br>San Francisco, California  94103 |
| BY: | **JOSEF D. COOPER, ESQUIRE** |

(Appearances continued on next page)

**Reported By:**   *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
*Official Reporter - U.S. District Court*
*Katherine Powell Sullivan, CSR, RPR, CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

**APPEARANCES (CONTINUED)**:

| | |
|---|---|
| **For Plaintiff**<br>**Indirect Purchaser**<br>**EMW, Inc.:** | Girardi & Keese<br>1126 Wilshire Boulevard<br>Los Angeles, CA  90017-1204 |
| BY: | **VINCENT J. CANTER, ESQUIRE** |

| | |
|---|---|
| **For Plaintiff**<br>**Phelps Technologies:** | Pearson, Simon, Warshaw & Penny, Llp<br>44 Montgomery Street, Suite 2450<br>San Francisco, CA 94104 |
| BY: | **BRUCE LEE SIMON, ESQUIRE** |

| | |
|---|---|
| **For Defendant**<br>**LG Display:** | Munger Tolles & Olson LLP<br>355 South Grand Avenue<br>Thirty-Fifth Floor<br>Los Angeles, CA 90071 |
| BY: | **BRAD D. BRIAN, ESQUIRE**<br>**JONATHAN ALTMAN, ESQUIRE**<br>**HAILYN JENNIFER CHEN, ESQUIRE** |
| | Munger Tolles & Olson LLP<br>560 Mission Street, 27th Floor<br>San Francisco, CA 94105-2907 |
| BY: | **JEROME CARY ROTH, ESQUIRE** |

| | |
|---|---|
| **For Defendant**<br>**AU Optronics:** | Nossaman LLP<br>50 California Street, 34th Floor<br>San Francisco, CA  94111 |
| BY: | **CARL LAWRENCE BLUMENSTEIN, ESQUIRE** |

| | |
|---|---|
| **For Defendant**<br>**LG Display:** | Cleary Gottlieb Steen & Hamilton<br>2000 Pennsylvania Ave., N.W.<br>Suite 900<br>Washington, D.C.  20006 |
| BY: | **MICHAEL ROBERT LAZERWITZ, ESQUIRE** |

| | |
|---|---|
| **For Defendant**<br>**Toshiba America**<br>**Electronics:** | White & Case<br>701 Thirteenth Street, NW<br>Washington, D.C.  20005 |
| BY: | **CHRISTOPHER M. CURRAN, ESQUIRE**<br>**JOHN CHUNG, ESQUIRE** |

| | |
|---|---|
| **For Intervenor**<br>**State of Illinois**<br>**(via telephone):** | Office of the Attorney General<br>Antitrust Bureau<br>100 W. Randolph Street<br>Chicago, IL  60601 |
| BY: | **BLAKE LEE HARROP** |

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Intervenor**<br>**State of Oregon**<br>**(via telephone):** | Haglund Kelley Jones & Wilder LLP<br>200 SW Market Street<br>Portland, OR 97201 |
| | BY: **MICHAEL G. NEFF, ESQUIRE** |

| | |
|---|---|
| **For Intevenor**<br>**State of Washington**<br>**(via telephone):** | Attorney General of Washington<br>800 Fifth Avenue, Suite 2000<br>Seattle, WA  89104-3188 |
| | BY: **BRADY R. JOHNSON** |

| | |
|---|---|
| **State of South**<br>**Carolina (AMICUS)**<br>**(via telepone):** | Hood and Felder<br>1517 Hampton Street<br>Columbia, SC 29201 |
| | BY: **SUSAN FOXWORTH CAMPBELL, ESQUIRE** |

- - - - -

1

2                      **P R O C E E D I N G S**

3 DECEMBER 9, 2011                              9:14 A.M.

4

5              THE CLERK:  Calling MDL 01827, In Re TFT-LCD.

6              (Pause in proceedings.)

7              THE COURT:  Counsel, have you stated your appearances

8 already?

9              MR. ALIOTO:  We have written them, Your Honor.

10             THE COURT:  All right.

11             There are two motions on today.  One is defendants'

12 motion to decertify the indirect purchaser classes or, in the

13 alternative, for summary judgment.

14             The second motion is defendants' motion to alter or

15 amend the indirect purchaser classes to avoid overlap

16 definitionally.  I am inclined to grant the second motion and

17 deny the first, but I will be glad to hear anything anybody

18 wants to add.

19             MR. BRIAN:  Your Honor, Brad Brian for LG Display.  I

20 will argue the first motion.

21             THE COURT:  That would be the global --

22             MR. BRIAN:  The motion to decertify, yes.  And with

23 the Court's permission, we have a chart we want to put up.  It

24 comes directly from our brief, page 8 of our opening brief.

25             In our motion we talk about four bases.  We talk

1  about ascertainability, notice, impact, and damages, each of

2  which we believe provides an independent basis to decertify.

3       What I'd like to do is focus most of my time on the

4  ascertainability and notice issues which we think are related,

5  and we think are fatal to the class.

6       I think what everybody has recognized, I think from

7  the start of this case, is that ascertainability and notice

8  were going to be major problems.

9       And, Your Honor, when you certified the class

10  initially, you relied expressly on representations by the

11  plaintiffs that they would solve the problem of

12  ascertainability by, one, adding new defendants -- which they

13  then failed to do in a timely manner -- and through model

14  numbers and the like by being able to determine the class

15  members had, in fact, purchased products with the panels

16  manufactured by the defendants.  They have failed to do that.

17  They have failed to do that.

18       Now, this chart shows -- this comes directly from

19  their own expert, Janet Netz.  It's undisputed that she has

20  found in her report that large percentages, large percentages

21  of class members bought products with panels that were not

22  manufactured by the defendants.  And those are the percentages.

23       For monitors you'll see that there's only one year,

24  2004, where there's less than 5 percent.  We have years as much

25  as 43 percent of the products contain panels manufactured by

1   non-defendants.  Notebook is not quite as bad, but 26.2, 22.3,

2   14.  Again, only four years less than 5 percent.  And we have

3   the percentage for TV.

4           What have they done to try to solve that problem?

5   What they did is, in opposition -- essentially, opposition to

6   this motion to decertify they came forward with what we believe

7   is an untimely, inadmissible expert declaration of John Metzler

8   who works for the same company -- he's the managing director or

9   managing partner of ApplEcon.  He provides expert assistance to

10  Janet Netz and others of the testifying colleagues.

11          We have made a motion to strike that on the grounds

12  that it's untimely, inadmissible expert testimony.

13          They claim it's summary witness.  And we don't think

14  it makes that standard, but I'm going to set that aside because

15  I think it's inadmissible for any of those reasons because they

16  haven't -- the documents being relied on are not admissible.

17  They include websites and the like.

18          But even if you credit, even if you credit Metzler,

19  the best you can get from Metzler is a reordering, a narrowing,

20  a substantial narrowing of the class, because Netz, while she

21  concedes -- while Dr. Netz concedes that large percentages of

22  the class members purchased products without the defendants'

23  panels, she has no way of determining which class members

24  purchased products with the defendants' panels and which ones

25  purchased product without the defendants' panels.  No way.

1          So Metzler comes forward in his declaration and he

2     comes up with I'll call it two and a half methods.  I, frankly,

3     can't figure out one of his methods at all.  I don't think it

4     adds anything.

5          But, he has this brand model method where he

6     identifies something like 9,000-plus models, and he says that

7     he can determine that 60 percent, 60 percent have panels

8     manufactured by the defendants.  60 percent.

9          And then in another model he calls the brand specific

10    model, he says he's able to trace some of the direct

11    purchasers, HP, Dell, Apple and two others.  And he says with

12    those he can determine to a hundred percent certainty which of

13    those contained panels manufactured by the defendants.

14         So I would respectfully urge the Court that we think

15    the class needs to be decertified for all the reasons we've

16    argued.

17         But, at worst for us, the Court needs to narrow the

18    class either by knocking out the 40 percent, if you're going to

19    credit Metzler at all, by knocking out the 40 percent and

20    narrowing the class or certifying the class to include only

21    those products purchased from the direct -- purchased by

22    consumers from the direct purchasers that he's able to identify

23    contain panels manufactured by the defendants.

24         Because, absent that, we have a situation where

25    large -- we know that large, large percentages of these class

1  members bought products with panels that were not manufactured

2  by my client or any of the other defendants.  And it's not a

3  "it's close enough."  It's not close enough here, and

4  Mr. Metzler's declaration admits that.

5            Now, I have problems with Mr. Metzler's declaration,

6  but I have more problems with the fact that for a year or so

7  you have been ordering the plaintiffs to come forward with

8  information on how they're going to do this, and they have not

9  done it.

10            Last time we were here the issue of notice came up.

11  And you turned to one of the plaintiffs' counsel who was

12  standing right here next to me and you, I'll say, requested

13  them to draft up a notice that would go out to the class

14  members so that the class members could decide whether to opt

15  in or opt out so that we would have adequate res judicata

16  protection.  I thought you suggested that they give that to us

17  in advance.

18            We have not seen it.  I thought I might get it this

19  morning.  I didn't get it.  And the reason, I think, we haven't

20  gotten it is because it's impossible to do for precisely the

21  reasons that I've identified, that they simply cannot ascertain

22  who purchased product with panels manufactured by the

23  defendants.

24            And so I'll leave that issue for now and reserve some

25  right to respond, but with all respect to Your Honor's

1  tentative I think this is a fatal problem.  And I think that

2  they have to figure out a way with the Court to cure it.  And

3  Metzler is a problem of admissibility.

4          But, as I say, for us, as I was thinking about this

5  last night, the worst for us I think -- because I think you

6  ought to decertify the class.  But the worst is it has to be

7  narrowed substantially, has to be narrowed or I think we have a

8  fatally-defined class.  I really respectfully submit that to

9  Your Honor.

10         The two other issues are impact and damages.  I

11 can -- I would say that in the -- in their opposition brief the

12 plaintiffs argued that we had not filed a Daubert motion.

13         We have filed a Daubert motion challenging the

14 admissibility of their experts.  And we deal with some of the

15 issues that impact, impact, if you will, and we provided a

16 notice to Your Honor because I'm happy to argue impact now.

17 I'm happy to argue damages now.  I'm also happy to defer it

18 until Your Honor has a time to review the Daubert motion, and

19 discuss those together.

20         I'll do whatever Your Honor wants.

21         **THE COURT:**  Well, the Daubert motion hasn't been

22 heard yet.

23         **MR. BRIAN:**  I understand that, Your Honor.

24         So, on impact, let me just say this.  The Courts have

25 struggled with the issue of impact in indirect purchaser

1  classes.  There are some courts that have certified classes.  I

2  recognize that.  There are other courts that have not.

3          There are courts in this building that have rejected

4  the precise -- I would argue, the precise models that have been

5  proffered to Your Honor as the basis for class certification.

6          Dr. Netz has been excluded by judges in this

7  courthouse, and Dr. Netz's modeling has been rejected as a

8  basis for class certification by judges in this courthouse.

9          Since the time you certified the class, evidence has

10  developed which we think shows, without a doubt, that they have

11  not met the test.

12          Dr. Netz testified under oath at her deposition that

13  her first model does not demonstrate, for example, that

14  everybody who purchased in 1999 suffered an overcharge.

15          She comes back with a second model.  And what that

16  second model shows is that in 2001, the direct purchasers paid

17  no overcharge at all and, in fact, paid less.

18          Their response to that is to talk about economic

19  theory or economic reality.  And I have problems with that in

20  the following respects.

21          One, in both *Graphics Processing* and *Flash Memory* the

22  courts rejected precisely that sort of analysis.

23          As Judge Alsup said in Graphics, even if the expert's

24  description of the industry is accurate, it does not suffice on

25  its own as a method of demonstrating impact to the specific

1   direct purchasers at issue here through common proof.

2           This is particularly problematic here.  It's not even

3   clear that -- other than her modeling exercise, it's not clear

4   that Dr. Netz offers any expertise about the industry.  And by

5   that I mean her expertise is the modeling.

6           And if the model doesn't meet the standard of the

7   general formulaic proof that is required to show impact, she

8   doesn't -- she can't supplement that.  She can't fill the gaps

9   by providing some unique expertise that she does not have.

10          The problem is made even worse when you look at the

11  passthrough -- and this we do talk about in the downward

12  motion.  But what she really essentially does is she assumes

13  that there is a passthrough.  She ignores the evidence where

14  direct purchasers -- there's been testimony that people did not

15  always pass through.  There were all kinds of reasons that

16  affected the prices that were charged through the consumers.

17  But her model assumes it.

18          She does nothing to deal with if there was a price

19  increase what caused it.  Was it caused by this particular

20  component?  Or was the price increase caused by the increases

21  in the prices of other components?  Her model does nothing to

22  address that.

23          Now, all -- one thing she does admit and one thing

24  that's undisputed in this case is we're talking about thousands

25  and thousands of different configurations of models and parts,

1  all of which can affect the price that is passed through, or

2  not, to the consumer.  Her model does not address that.  So

3  under the case law that we have submitted, we think that her

4  model does not meet it.

5          Then she gets -- then we get to the fluid recovery

6  problem on damages.  And the approach that they have utilized

7  runs directly into what's prohibited in the Ninth Circuit in

8  the *Hotel Telephone* case.

9          Because they are using an averaging system that will

10  have the effect of providing damages to people that were not

11  injured.  Period.

12          And in the Supreme Court case, in the *Dukes* case the

13  Supreme Court made clear that we have a right to defend the

14  individual claims.  You cannot use a class action procedure to

15  essentially run amuck and run afoul of the Rules Enabling Act

16  and prevent us from defending ourselves against individual

17  claims.

18          The plaintiffs are upfront about it.  They say that's

19  just a post administrative ministerial act.  It's not.  And

20  that's what the Supreme Court makes clear in *Dukes*.  You can't

21  solve the problem by assuming impact, assuming passthrough, and

22  then say they'll deal with it at the administrative side of it.

23  That's not the way you solve the problem.

24          So we think that the evidence that has developed

25  since Your Honor certified the class reveals how deficient the

1  class is.  Both under impact, under damages, and, most

2  importantly, as I started, under ascertainability and notice.

3          I would like some time to respond, if I could, Your

4  Honor.  Thank you.

5          **THE COURT:**  Mr. Corbitt.

6          **MR. CORBITT:**  Thank you, Your Honor.  Craig Corbitt

7  for the indirect purchasers.

8          I hesitate to say this because I don't want to cast

9  aspersions on opposing counsel, particularly since he is new to

10  the case, but there is an old book called *How to Lie With*

11  *Statistics*.  And this chart is a good example of the problem

12  that that book points out.

13          As Your Honor said in her class certification order,

14  the defendants have an overwhelming market share.  And the fact

15  is, if you add a column to the end there and put total for the

16  entire period, according to revenue, the numbers would be

17  2.6 percent for TVs were not sold by the defendants,

18  6.8 percent for notebooks were not sold by the defendants, and

19  12.1 percent for monitors were not sold by the defendants.

20          **THE COURT:**  When you say "total," what do you mean?

21  If you average this?

22          **MR. CORBITT:**  For the entire class period, if you

23  take the revenues, the sales throughout the class period, then

24  the percentages of the market defined that way that the

25  defendants sold were 97.4 percent of TVs, 93.2 percent of the

1    notebooks, and 87.9 percent of monitors.

2            And this is what we said on class cert.  I mean,

3    we've refined it by a few tenths of a percent in each of those

4    categories, but it is the same thing.

5            The market share is overwhelming.  And, of course,

6    the reason for that is, hardly any of these things were sold in

7    1999 and 2000.  The market was just getting off the ground.

8    You have to get into '01, '02, and especially '03, '04, '05.

9    Those are where the big sales are.

10           So these numbers and this chart, I respectfully

11   submit, are very misleading.  And the thing that needs to be

12   focused on in terms of the class as a whole are, what were the

13   market shares of the defendants during the class period?  And,

14   as you held in your class certification order, or noted, the

15   market share of the defendants was overwhelming.

16           That is still the case.  That hasn't changed.  I

17   mean, the defendants have quarreled with a lot of things in

18   this case, but the basic parameters of what the sales were and

19   what they controlled of the market, they have not and cannot

20   challenge because it's from their own numbers.  Or from Display

21   Search, which is a service they all subscribe to.  Those were

22   the sources of it.

23           So all of the predominant common issues that Your

24   Honor identified before, when you certified this class, are

25   still there, when I argued this motion before you two years

1  ago.

2         The overwhelming one, of course, is the conspiracy

3  and also the common impact from the -- from the effect of the

4  direct purchasers and then the indirect purchasers on the

5  cartel.

6         And I think your Honor properly recognized that a

7  couple of days ago when you issued the order denying the motion

8  on the *Associated General Contractors* issue on the 14 states.

9  That was exactly right.

10        Now, the key in terms of ascertainability, which is

11  an issue that they are focusing on, obviously, primarily now,

12  is this class is objectively ascertainable.  And that is the

13  test under the law and the test that's been applied uniformly

14  in the cases that we cited.

15        This is not a situation where this is any subjective

16  element as to who is in the class and who isn't.  Okay.  It is

17  a physical product.  It gets incorporated into another product.

18  It then gets sold.

19        So at some level it is possible for every single

20  product to be identified if you open the box or did something,

21  which, frankly, we think is an unreasonable burden to impose on

22  class members or on the class, given the share of the market

23  the defendants have.

24        But it is highly likely, highly likely, given the

25  market shares, that the products that any plaintiff class

1   member purchased during the class period is going to have

2   contained a defendant panel.  It's 90 percent likely.

3            And we don't have to establish, I would submit, under

4   the law, who the class members are, at this stage of the case,

5   to have a class certification.  We don't have to establish that

6   it's a hundred percent of the class members, in fact, bought

7   something.  We don't have to do any of that.  And we cited

8   cases, the *SRAM* case.

9            Judge Wilken denied a motion to decertify on exactly

10  the basis that there was -- based on the market share that the

11  defendants had.  And that was a case where it was far more

12  difficult to figure out what product the SRAM was in than this

13  case.

14           There's Judge Walker in the *Blue Sky Beverage* case,

15  other cases from Judge Henderson and Judge White that we've

16  cited, none of which were extinguished by the defendants in

17  their opposition.

18           Now, the thing that we said before when the class was

19  certified, that turned out not to be as we expected, was that

20  the defendants would have information and the industry would

21  have information that would allow the ready identification of

22  all of the products in which the flat panels were contained.

23           The defendants say they don't keep that information,

24  all right.  The third-party intermediaries, the ODMs, OEMs.

25  Some of them do.  Some of them don't.  We've got a lot of

1    those, as I'll explain in a minute.  But we don't have all of

2    it.

3          Well, this is the classic situation under *J. Truett*

4    *Payne*, under *Bigelow*, *Story Parchment*.  There's an antitrust

5    violation that's been committed.  There's a cartel that was in

6    effect over a long period of time.  And we don't have perfect

7    proof of everything that in an ideal world we would have in

8    order to solve this issue.

9          But, respectfully, that's the defendants' problem.

10   That should not be the plaintiffs' problem.  You don't throw

11   out the baby with the bath water because you can't tell exactly

12   who the 10 percent are that may have bought a product that did

13   not contain the panel.  That would be a totally inappropriate

14   remedy.

15         Now, we answered interrogatories that they served six

16   or eight months ago, and we gave them a list of thousands of

17   products that we know contain these panels from records we got.

18   We recently supplemented that list.  We gave them thousands

19   more.

20         Mr. Metzler's declaration, which certainly was not an

21   expert declaration, he did that entirely under the supervision

22   of my office, my partner Ms. Zahid in particular.  It was a

23   compilation of the information that we had.

24         And he lists, again, and comes up with many, many

25   more, the models that we, in fact, were able to determine with

1   100 percent certainty are in the class.

2          And he has a whole extensive other list where, based

3   on comparing the sales of the defendants to the ODMs or OEMs

4   that they have product, and comparing purchase lists and so

5   forth, were able to determine that it's 95, 98, 99 percent

6   likely that the class member would have bought something

7   containing that panel because the product that was

8   manufactured, 99 percent of them contained defendants' panels.

9   Okay.

10         I think it's admissible, but it's not something that

11  should even matter now.  We don't need -- in order to prove up

12  this case and to prove the requirements of Rule 23, we don't

13  need the report from Mr. Metzler or any particular person

14  saying that here are all of the model numbers.

15         We think that we -- that that becomes relevant when

16  we come to the point of a claims form and when the -- when the

17  money is actually paid out.

18         We've also identified entire categories where

19  everything was made with the defendant panels.  All large TVs

20  over 27 inches, all Sony 14-inch notebooks, all Apple products,

21  all Hewlett-Packard, 15 percent notebooks, and any others where

22  identification is easy because there is a sticker on the back

23  or, in the case of Dell notebooks, you can go in the system

24  folder and have a drop-down menu and figure it out.

25         And out of all this there were only a few hundred

1   models out of these, I think, nearly 10,000 that were looked at

2   that did not contain defendant panels, which is entirely

3   consistent with the market share evidence.

4        So we have done the due diligence on this.  We did as

5   much as we could do.  We're still trying to do it.  We

6   certainly did not sit around like the defendants claimed and

7   not to anything and ignore, because, you know, we certainly

8   understood Your Honor's -- what Your Honor said last time.  And

9   I remembered what I said and what was said and what we said in

10  the briefs.  And we have made, I submit, every reasonable

11  effort that we could to address this.

12       Now, the standard of proof for determining whether

13  someone is a member of the class or not, I submit at the

14  appropriate time, is not beyond a reasonable doubt.

15       You know, this is a civil case.  It's a preponderance

16  of the evidence standard.  If somebody bought a television,

17  flat-panel television manufactured by Sharp, for example, and

18  you know, Sharp may have 2 percent of their televisions that

19  contain somebody else's panel or a non-defendant panel, the

20  odds are so overwhelming that the particular class member is

21  going to have a product containing that panel, that, I think,

22  should be enough.

23       But, more importantly, it's not even the defendants'

24  issue, at that point, because I certainly take issue with the

25  assertion that under the Wal-Mart case or anything else, that

1   we need to go through and do a person-by-person calculation of

2   what the damages would be.

3            Even if that were true, of course, individual damage

4   issues never defeat class certification.  That's a standard law

5   in price-fixing cases, as long as you have the overwhelming

6   common issues of conspiracy and impact, which we do.

7            But we intend to calculate damages on a class-wide

8   basis.  We have two experts now, Dr. Netz and Dr. Comanor from

9   UCLA.

10           By the way, in case I forget, Dr. Netz's testimony

11  was never excluded.  There has never even been a Daubert motion

12  filed against her until the day before yesterday.  The Court

13  may choose to accept it or not accept it, but it's never been

14  excluded.

15           Our experts estimate that damages based on the total

16  volume of the commerce in this country that went into the

17  indirect purchaser products of the three categories at issue,

18  something like -- I'll just give a round number -- 20 billion

19  and a round estimate of 10 percent, so the damages are

20  $2 billion, actually a little more than that in both of

21  their -- in both of their cases.

22           And we think that it's perfectly appropriate to give

23  a number for the class as a whole and get a -- a judgment

24  entered against the defendants for the class as a whole.

25           And I base that in part on the ABA model jury

1  instructions in civil antitrust cases.  This was instruction 7,

2  Class Damages.  And the ABA, of course, is not known for

3  bending things too much toward the plaintiff side of things.

4         But it says -- I'm going to quote, Plaintiff is

5  seeking to recover damages on behalf of a class of purchasers.

6  To award damages for the class, you need not determine the

7  overcharge paid by each class member with precision.

8         It is sufficient for you to determine the average

9  overcharge paid by each class member or estimate the overcharge

10  paid by each class member so long as the average or estimate is

11  based on evidence and reasonable inferences.  You may not

12  engage in guesswork or speculation, et cetera.

13         So the defendants -- we're going to put in evidence

14  at this trial that the defendants caused damages to the

15  indirect purchaser class, as Your Honor has defined it, in this

16  country, of well over $2 billion.

17         At that point, if the jury agrees with us, or

18  whatever number that they do, we think judgment should be

19  entered, and it no longer, really, is the concern of the

20  defendants who gets to share in that $6 billion,

21  hypothetically, minus the settlements we have.

22         It's really not their concern, I would submit.  And,

23  certainly, the fact that the class cannot be ascertained with

24  100 percent precision, at this point, is not something under

25  any case that they've cited that should defeat class

```
 1    certification.

 2              On impact, just briefly, as I mentioned, we think

 3    Your Honor got it exactly right on Associated General

 4    Contractors.   And the presumption of impact under cases like

 5    Bogosian, the Rubber Chemical case here from Judge Jenkins,

 6    there are many, many others and, of course, under the

 7    Cartwright Act and the various state laws that we're pursuing

 8    the case under provide for a presumption of impact in

 9    price-fixing cases.

10              Now, it is just simply not the case that the experts

11    just rely on economic theory for that.   They did an enormous

12    amount of empirical work as even the defendants' experts

13    acknowledge.   And the defendants' experts quibble with the

14    results of that and say they should have made different

15    assumptions.

16              But it's interesting, even the defendants' -- I'll

17    call them two main experts, I think.   Dr. Carlton, who was

18    their expert principally on liability and the amount of the

19    overcharge, he says, well, you know, this conspiracy, I don't

20    see how it ever could have been effective in this market, and

21    they met for six years but, you know, didn't really accomplish

22    anything but, you know, I've done an alternative way to

23    calculate what the overcharge was, you know, and that's a

24    congregate of what they're talking about, but I can see how you

25    could get to 1 percent.
```

1              That's basically his opinion.  All right.

2              And then Professor Snyder, who you recall was their

3    expert on class certification and submitted some material in

4    connection with this motion, well, you know, he's still saying

5    I don't see how you could ever figure this out because the

6    distribution chain is so convoluted, et cetera, but if someone

7    were to force me to do something, I could concede that

8    50 percent -- I think he said 48 percent -- of the overcharge

9    was passed through to consumers.  He even has a chart in his

10   report.

11             So if you put these things together, they're

12   conceding there is over a hundred million dollars of damages

13   just even with those, we think, unreasonably low estimates in

14   this case.

15             And, you know, it's done without any attempt to say,

16   well, I need to know who is in the class or who's not before I

17   can even render an opinion on that, or anything like that.

18             So, obviously, even they concede that it could be

19   done.

20             I think, Your Honor, this is a classic situation of

21   the defendants who are, in LG's case at least, you know,

22   confessed felons, price fixers, of trying to throw the baby out

23   with the bath water and say that, well, because there's some

24   people that we can't figure out, let's just decertify the class

25   and then we can avoid paying anybody, despite their promises on

```
 1  restitution and so forth.  And I think that's entirely

 2  inappropriate.

 3          Now, so that's what I have to say on the motion to

 4  decertify.  If you want me to address the other motion now or

 5  wait --

 6          MR. BRIAN:  I'm going to respond, if I may, Your

 7  Honor.

 8          THE COURT:  Let's do the second one second, although

 9  I do have another matter on calendar.

10          MR. BRIAN:  I know.  I'll try to it keep it brief,

11  Your Honor.  Obviously, this is an important motion to us.

12          Your Honor, at the hearing on July 14th in 2010, you

13  said in response to a comment by Mr. Scarpulla that you were

14  glad he was going to address the issue of ascertainability

15  because, quote, I think there's substantial merit to the view

16  that they ought to be able to tell who's in, meaning who's in

17  the class.

18          And they said in their brief that they would do two

19  things.  They said that, typically, they can determine that

20  based on the model number alone, because most models -- I'm

21  quoting -- because most models contain panels made by a single

22  manufacturer.

23          They then said -- and I'm quoting -- Plaintiffs will

24  obtain information from the OEMs identifying models using LCD

25  panels made by non-defendants, and serial numbers of units with
```

1   panels made by non-defendants for the rare model that used

2   panels from both defendants and non-defendants.

3           In your order, you said -- you relied on that, and

4   you said, in making your order, that the plaintiffs state that

5   they will obtain information from the OEMs, identifying models

6   using LCD panels made by non-defendants, and the serial numbers

7   of units with panels made by non-defendants for the rare models

8   that used panels from both defendants and non-defendants.

9           That was a premise at the time Your Honor certified

10  the class.  I heard counsel make no response to the question of

11  why we haven't seen a draft notice.  He said nothing about it.

12          You could not have been clearer at our last hearing

13  that they were to draft a notice, run it by us and bring to the

14  Court.  And we were going to discuss it at this hearing.  They

15  haven't done it because they can't do it.

16          And he says that we're manipulating the data.  Look

17  at that chart.  That is their own evidence.  And they take the

18  later years and they want to go back to the earlier years,

19  okay.

20          Take out the earlier years.  And even in the later

21  years, the monitors we're talking about 13.8 percent as late as

22  2006 involved products that had panels not made by the

23  defendants.

24          I would represent -- I would urge the Court that

25  whatever you do, we should not be held to a class where you've

1  got percentages in anything above 5 percent.  That's just not

2  close enough.  And he says, well, it's 90 percent likely, was

3  the phrase he used.  "90 percent likely."

4         We're talking about hundreds of millions of dollars

5  for that 10 percent that he's representing to the Court, based

6  on no evidence that he's representing to the Court.

7         Metzler is expert testimony.  We've not been able to

8  take his deposition.  He's not provided an expert report.  It's

9  simply not adequate.

10        For him to say, well, we've pled guilty and,

11  therefore, it's just too bad that we need to come forward,

12  that's not the law.  It is their burden.

13        And on this averaging thing they are confusing

14  damages with impact.  They have to show an impact on every

15  class member.  That's the rulings of the courts.

16        Now, once they show the impact, the courts disagree

17  as to how much latitude will be given to the plaintiffs in

18  showing damages.  I understand that.  That's not unique to an

19  antitrust case.

20        I mean, there's -- concepts of damages often can get

21  a little bit looser.  But the law is clear that they need to

22  show impact.

23        In my judgment, Your Honor, I would submit to the

24  Court that they have not done what they expressly told Your

25  Honor they would do and on which you relied.

1    They have not answered the questions of

2 ascertainability.  They have not provided a notice.  And

3 Dr. Netz's and the other experts' models are inadequate.

4    I may have misspoken, and I apologize, when I said

5 that Dr. Netz's testimony was excluded.  It was not excluded on

6 a Daubert motion.  It was rejected even before we got to a

7 Daubert motion by the two courts who found that her model was

8 not an adequate basis for class certification.  And class

9 certification was denied on that basis.

10    Thank you.

11    **THE COURT:**  Thank you.

12    Now, did you want to be heard on the second motion?

13    **MR. CORBITT:**  Could I just respond on the notice

14 points, Your Honor?

15    **THE COURT:**  Very briefly.

16    **MR. CORBITT:**  As Your Honor, I think, is aware, we

17 have settlements with six out of the nine defendants or

18 defendant groups.  I know it has been a long process.

19    **THE COURT:**  Yes.

20    **MR. CORBITT:**  I think we are almost there.  I

21 understand that three of those six agreements are fully signed

22 and ready to go.  There are a couple of issues we're working

23 out with the others, but we expect to be there very soon.

24 And --

25    **THE COURT:**  Any idea when "very soon" is?

1       **MR. CORBITT:**  You know, it's one of those things I

2  keep thinking it's going to be the day after tomorrow, and it

3  turns out ... so I hesitate to give an exact date.

4       Mr. Cooper is here, who has been dealing with some of

5  these issues more directly.  Perhaps he or Mr. Alioto would

6  have an estimate.

7       **MR. COOPER:**  Your Honor, Josef Cooper on behalf of

8  the indirect purchaser plaintiffs.

9       We have assumed internally that we had to get the

10  documents with regard to preliminary approval and notice to you

11  before -- the deadline would be, basically, the 23rd December,

12  before the Christmas break, in order to provide an opportunity

13  for people who might want to comment on the documents and for

14  Your Honor to consider during the month of January.

15       So that's the schedule we've been having.  We had

16  hoped to do it sooner, but we have multiple sets of defense

17  lawyers, we have eight Attorneys General, everyone looking at

18  the same documents, with different comments.

19       It just sometimes gets to be a little chaotic in

20  trying to keep it all straight.  But we have internally set a

21  deadline of getting the documents filed before the Christmas

22  break.

23       And we understand Your Honor is out, based on the

24  posting on the website, during the week between Christmas and

25  new years but would be back in January, and then we would be

```
1   asking Your Honor for a hearing date in mid/second half of
2   January.
3           We have a notice plan and schedule which requires
4   that we tell Kinsella, the people who have also handled the
5   notice by the direct purchaser, by February 1st that they can
6   proceed with placing the ads and getting the notice out in
7   order to have the notice program and the opt-out period
8   conclude before the trial date of April 23rd.
9           THE COURT:  You said you expect to file by
10  December 23rd?
11          MR. COOPER:  Yes.
12          THE COURT:  Thank you.
13          MR. COOPER:  Thank you, Your Honor.
14          MR. HARROP:  Your Honor, this is Blake Harrop, from
15  the State of Illinois.
16          I just wanted to clarify Mr. Cooper's comments that
17  when he refers to eight state AGs looking at those papers, that
18  Illinois is not one of those states that has been given a
19  chance to do that.  And I don't think that Washington has
20  either.
21          I want to make sure it's clear on the record.
22          MR. COOPER:  It's the eight states, Your Honor, who
23  are participating in the settlements.
24          Mr. Miller from California is here today, if you
25  need --
```

1          **THE COURT:**  Let me ask a different question then.

2          Have you presented these papers or the documents to

3   Illinois and Washington State?

4          **MR. COOPER:**  We have not presented the documents to

5   them.  We would like to get them in the form we're presenting

6   to the Court, and then they will have an opportunity before

7   they would come before Your Honor to comment.

8          They have made, of course, certain comments already

9   with regard --

10         **THE COURT:**  Well, they've made motions.  And I've

11  been putting the motions off until you get me the papers on the

12  settlements --

13         **MR. COOPER:**  Right.

14         **THE COURT:**  -- in the expectation that perhaps some

15  of these issues would be resolved.

16         Are you suggesting they are not going to be?

17         **MR. COOPER:**  I'm not certain that they will all be

18  resolved, Your Honor.  I think some have been.  But I'm

19  expecting that they will have additional comments.

20         **THE COURT:**  Okay.

21         **MR. COOPER:**  Or the same comments stated again.

22         **THE COURT:**  Okay.  All right.  Well, thank you,

23  Counsel, for making that distinction because it's an important

24  one, and now I appreciate what's going on.

25         **MR. COOPER:**  Thank you.

1          THE COURT:  Thank you.

2          MR. COOPER:  Thank you, Your Honor.

3          THE COURT:  Okay.  Very briefly, do you wish to

4  address the second motion --

5          MR. CORBITT:  Yes.

6          THE COURT:  -- re definition?

7          MR. CORBITT:  Yes, Your Honor.

8          We just don't see why it's necessary to essentially

9  double the size of the class definition by --

10          THE COURT:  Let me tell you, by the way -- and I

11  should say this first, and I want to hear from defense if

12  there's an issue with this.  I felt that the articulation of

13  the amended parameters was cumbersome.  So my articulation

14  would be as follows, instead of what the defendants have

15  proposed.

16          It would be all persons and entities in like state

17  who from January 1, '99 to December 31, 2006, as residents of

18  the state, purchased LCD panels incorporated in televisions,

19  monitors and/or laptop computers in the state -- and now here

20  comes a change -- primarily for personal, family, or household

21  purposes, indirectly from one or more of the named defendants

22  for Quanta Display, Inc. for their own use and not for

23  resale -- here's the change -- except for persons who fall

24  within the definition of the certified direct purchaser class

25  in this Multi District Litigation 1827, and did not opt out of

1  that class.

2         So it's, essentially, the same thing as the defense

3  had wanted, but it's less long than what they had said.

4         So, anyway, with that comment, I'll be happy to hear

5  from you.

6         **MR. CORBITT:**  Well, one question, Your Honor.

7  Perhaps I misheard you, but you had the phrase "for personal,

8  family or household" --

9         **THE COURT:**  Right.

10        **MR. CORBITT:**  -- "usage," which I think for a couple

11 of the states, Rhode Island and Missouri, I think Your Honor's

12 determined that that's -- that that's appropriate.  And I'm not

13 here today to argue that.  But the class itself contains many,

14 many end user businesses.

15        The indirect purchasers are not just household

16 consumers.  They are companies like Bank of America, Wells

17 Fargo.  You know, big companies.  And that, actually, is the

18 basis of my concern about this motion.

19        And the second point I wanted to make in addition to

20 the somewhat convoluted formulation the defendants had, which

21 is, I don't know whether it's the case that Bank of America,

22 just to take an example, bought $10,000 worth of product

23 directly and will submit a claim form in the direct purchaser

24 settlement to be paid as a basis of that.

25        **THE COURT:**  Well, you know, I apologize, Mr. Corbitt.

*Katherine Powell Sullivan, CSR, RPR,CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*

1  I misled you and the defense as well.  The "primarily for

2  family or household purposes" I would only put in the Missouri

3  and Rhode Island definitions.

4          **MR. CORBITT:**  Okay.  Thanks.

5          But my point would be, Your Honor, the defendants are

6  not at any risk of duplicative purchases.

7          We think that a company like Bank of America or

8  anybody, if it's a consumer, conceivably, who bought from

9  Samsung.com and went to Best Buy and bought something else, so

10  they are in both classes, it's a separate injury.  They are in

11  both classes, a separate purchase.  They ought to be able to

12  recover for both.

13          And we have the same claims administrator, Rust

14  Consulting, that we intend to use here, the same website we

15  intend to use here.  And it would not be a difficult matter to

16  sort this out and have one check for the direct class and one

17  check for the indirect class.  We think that's how it ought to

18  be done.

19          I recognize that the releases in the direct purchaser

20  settlements are very broad, as is typical in these cases.  But,

21  by the same token, I would submit that the direct co-lead

22  counsel were appointed to represent the direct purchasers, and

23  we were appointed to represent the indirect purchasers.  And we

24  don't like to see, potentially, a lot of the money not going to

25  members of our class simply because there may be some confusion

1  that they are releasing the right to recover from our class as

2  well.

3          So, that was the basis for our opposition to the

4  motion.

5          **THE COURT:**  Thank you.

6          Well, that will be submitted.  I don't think I need

7  to hear anything further from the defense on that.

8          **MR. CURRAN:**  Your Honor, this will just take a

9  moment.

10         Christopher Curran for the Toshiba entities.  I would

11 just like to close the loop on an issue that you and I had had

12 an exchange on when I was before Your Honor last month.  It

13 relates to the Toshiba depositions and whether there are Fifth

14 Amendment issues.

15         We have now had an exchange with the Department of

16 Justice, at your request at the last hearing, and we have

17 received definitive word that there will not be any charges

18 against Toshiba or any of Toshiba people.  So, the Toshiba

19 depositions are going forward promptly.

20         **THE COURT:**  Good.  All right.

21         **MR. CURRAN:**  Thank you.

22         **THE COURT:**  Thank you.

23         Anything else?

24         **MR. SIMON:**  Your Honor, this is Bruce Simon on behalf

25 of the direct purchasers.

1          They are not all going forward.  Some of them are

2   starting tomorrow, Saturday.  Two of the witnesses have refused

3   to revoke, despite the definitive statement that counsel

4   represents that he got.

5          Those are Caperton and Hertweck.  And we might have a

6   dispute with the special master about how we handle this issue.

7   So if he got definitive word, I'm not sure why two people are

8   not revoking.

9          **MR. CURRAN:**  Maybe this isn't as brief as I thought,

10  Your Honor.

11         But the two people Mr. Simon is referring to are not

12  affiliated with Toshiba.  They are former employees who also

13  worked at other companies.  We are still working on that.

14         The statute of limitations just expired as to Toshiba

15  yesterday.  So these people now have the comfort they should

16  need.

17         Our position, of course, is they don't have a Fifth

18  Amendment right anymore, if there's been definitive word from

19  DOJ.  So if they take a little more convincing, so be it.

20         I actually think that Mr. Hertweck, one of the people

21  involved, has agreed to waive -- to revoke the invocation of

22  the Fifth Amendment and will be testifying.

23         The other, Ms. Caperton, I don't have word from.

24  But, as I say, give me a little more time on that.

25         **THE COURT:**  All right.  Well, at least one issue has

1  been resolved, which is that Toshiba, the statute has run on

2  Toshiba.

3          MR. CURRAN:  That's right.

4          THE COURT:  So this will all work out in the

5  performance of time --

6          MR. CURRAN:  I think so.

7          THE COURT:  -- I'm confident.

8          All right.  Mr. Alioto.

9          MR. ALIOTO:  You'll see how brief it is, Your Honor.

10         They included in this motion the motion to bifurcate.

11         THE COURT:  Who included --

12         MR. ALIOTO:  The defendants, the defendants included

13 in the motions that were on for hearing today, a motion to

14 bifurcate.  They didn't even cite 42(d).  They didn't cite any

15 of the reasons that would ordinarily accompany 42(d).  So we

16 submit that it should be summarily denied.

17         THE COURT:  Okay.  Thank you.

18         MR. ALIOTO:  Thank you.

19         THE COURT:  All right.  Thank you very much.  The

20 matter is submitted.

21         MR. CORBITT:  Thank you, Your Honor.

22         (At 10:04 a.m. the proceedings were adjourned.)

23                      -   -   -   -

24

25

1

2                        <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:   Friday, December 16, 2011

7
                        s/b Katherine Powell Sullivan
8                   _____

9          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                          U.S. Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25